## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
TROY NOCK,                              )
                                        )
            Petitioner,                 )
                                        )
            v.                          )        Civil Action No. 10-10158-RGS
                                        )
GARY RODEN,                             )
                                        )
            Respondent.                 )
_____)

## REPORT AND RECOMMENDATION ON
## PETITION FOR WRIT OF HABEAS CORPUS

### January 31, 2011

BOAL, M.J.

On January 26, 2010, Troy Nock ("Nock"), who is currently serving, inter alia, two life

sentences in a Massachusetts correctional facility, petitioned this Court for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). [Docket #1]. The Respondent, Gary Roden, opposes the

Petition. [Docket #26].

Nock was convicted of breaking and entering in the night with intent to commit a felony,

aggravated rape, assault and battery by means of a dangerous weapon, threat to commit a crime,

and being a habitual offender. In his petition, Nock argues that (1) his wife's out of court

statements to the police should not have been admitted into evidence as excited utterances and

that the admission of such statements violated his Confrontation Clause rights under the Sixth

Amendment; (2) the trial court's denial of his motion for a new trial based on the court's denial

of his discovery request for allegedly exculpatory evidence in the form of employee proficiency test results and laboratory audits violated his Due Process rights under the Fourteenth Amendment; and (3) the combination of the admission of his wife's out of court statements and the denial of access to the requested DNA materials denied him a fair trial.[1]  For the reasons set forth below, I recommend that the District Judge DENY the Petition.

## I.  PROCEDURAL BACKGROUND

On October 7, 2003, a Norfolk County grand jury returned an indictment charging Nock with: (1) breaking and entering in the night with intent to commit a felony, in violation of M.G.L. c. 266, § 14; (2) aggravated rape, in violation of M.G.L. c. 265, § 22(a); (3) assault and battery by means of a dangerous weapon, in violation of M.G.L. c. 265, § 15A(b); (4) larceny over $250, in violation of M.G.L. c. 266, § 30; (5) threat to commit a crime, in violation of M.G.L. c. 275, § 2; and (6) three counts of being a habitual offender, in violation of M.G.L. c. 279, § 25.  (Supplemental Answer ("S.A.") 87-95). [Docket #12].

### A.  Pre-Trial Motions for DNA Evidence

Before trial, Nock retained Forensic Bioinformatics to independently review the Commonwealth's discovery packet that included the case files from the State Police Crime Lab

---

[1]  Nock also claimed in his petition that a blood sample was taken from him without counsel present and against his will prior to his indictment.  Petition at 11.  Respondent filed a motion to dismiss his petition based on the fact that this claim was not exhausted in state court. [Docket #13-14].  Nock withdrew this claim after Magistrate Judge Collings issued a Report and Recommendation recommending that Judge Stearns allow the motion to dismiss unless Nock withdrew this claim. [Docket #18, 19].

and Cellmark,[2] as well as electropherograms,[3] and electronic data. (S.A. 414). Because the results of their review did not "provide the defendant with exculpatory evidence," Nock requested funds to retain a second expert in forensic DNA analysis. (S.A. 413). The trial judge allowed this motion on January 19, 2005. Id.

In September 2004, Nock's counsel filed several motions for DNA discovery. (S.A. 6-7; State Docket #23-36). One of these motions requested:

> "All documents, reports, notes or correspondence concerning any internal or external, blind or non-blind, closed or open, proficiency tests, conducted by, contracted for, or administered to Cellmark, the Massachusetts State Police Crime Laboratory, and the specific personnel involved in the examination, testing and evaluation of the tests conducted in this case, whether results were obtained, reported or published, including all results of any proficiency testing which was conducted."

(S.A. 141-2).[4] This motion was denied on January 12, 2005. Id. On May 5, 2005, Nock's counsel moved for reconsideration of the judge's decision on this and other requests, and made a new request for "[a]ll audit reports of all audits of Cellmark and Massachusetts State Police Crime Labs, covering the period 2001 to present, including all internal audits and external audits conducted by accrediting associations." Id. On May 31, 2005, the trial judge referred the motion to the judge who decided the original motions. (S.A. 350). On June 2, 2005, the motion judge allowed the motion with respect to Nock's request for the standard operating procedures of the Quincy Police Department and the expiration dates of the test kits and solutions used in the

---

[2] Orchid Cellmark is one of the outside laboratories that the State Police Crime Laboratory used to assist with its DNA case backlog. (Tr. IV/86-88).

[3] An electropherogram is a graphic result of PCR-based DNA testing. Richie v. Runnels, No. 06-6653, 2009 U.S. Dist. LEXIS 128049, at *32, n. 10 (C.D. Cal. December 2, 2009).

[4] This motion was not provided in the Supplemental Answer, but is referenced in a subsequent motion contained in the Supplemental Answer that was filed by Nock's counsel.

DNA testing in the case, but not with respect to the audits and proficiency tests.  Id.

B.    Trial

A jury trial commenced on June 27, 2005.  (S.A. 4).  On July 5, 2005, the jury found Nock guilty of all charges except larceny over $250.  (S.A. 378).  The trial judge sentenced Nock to life in prison for breaking and entering in the night; life in prison for aggravated rape (from and after the sentence for breaking and entering in the night); ten years for assault and battery with a dangerous weapon (concurrent with the sentence for aggravated rape); and six months for threat to commit a crime (concurrent with the sentence for aggravated rape and assault and battery with a dangerous weapon). Id.

C.    Post-Trial Motions Regarding DNA Evidence

On September 26, 2005, the trial judge allowed petitioner's motion to file a late notice of appeal.  (S.A. 13).  The appeal was stayed while Nock pursued a motion for new trial. (S.A. 379).  In his new trial motion, Nock contended that the judge abused her discretion by denying his request for lab audits and proficiency test results, that the Commonwealth failed to disclose this material, and that the jury was given a misleading view of DNA evidence involving the State Crime Laboratory.  (S.A. 112-132).  Nock also argued that the failure to investigate or contest the taking of a blood sample from him constituted ineffective assistance of counsel. (S.A. 132-136).  On June 27, 2008, the judge denied petitioner's motion for a new trial without a hearing.  (S.A. 14).  Nock filed a notice of appeal from the denial of his new trial motion on July 18, 2008.  Id.  The Court consolidated the direct appeal with the appeal from the denial of the motion for new trial on July 25, 2008. (S.A. 15).

D.     Appeal

On appeal, Nock raised the following claims: (1) the statements by petitioner's wife should not have been admitted as excited utterances; (2) the denial of petitioner's motion for a new trial was an abuse of discretion because exculpatory evidence had not been produced; and (3) that these errors taken together create a substantial risk of a miscarriage of justice. (S.A. 21). The Massachusetts Appeals Court affirmed Nock's conviction and the denial of his motion for new trial on July 23, 2009. Commonwealth v. Nock, 74 Mass. App. Ct. 1126 (2009). (S.A. 462).

On August 13, 2009, Nock filed an application for further appellate review that raised the following claims: (1) Nock was denied his right to exculpatory evidence in the possession of the government; (2) admission of the statements of petitioner's wife to the police violated the Confrontation Clause; and (3) these errors cumulatively were so prejudicial that they created a substantial risk of a miscarriage of justice. (S.A. 467-468). The Supreme Judicial Court denied further appellate review on September 30, 2009. Commonwealth v. Nock, 455 Mass. 1101 (2009) (S.A. 513).

On January 26, 2010, Nock filed the instant petition ("Petition"). The District Court judge referred the case to this Court for a report and recommendation on July 26, 2010. [Docket July 26, 2010]. On September 13, 2010, Nock filed a Memorandum of Law in Support of Application for Habeas Relief ("Memo. in Supp."). [Docket #25]. On October 1, 2010, Respondent filed a memorandum in opposition to the petition. ("Res. Br."); [Docket #26]. Nock filed a rebuttal and response on October 18, 2010 ("Rebut."), [Docket #27], and a Supplemental Memorandum of Law to Address Trial Record on January 20, 2011. [Docket #29].

## II.     FACTUAL BACKGROUND[5]

On the night of December 27, 2000, the victim was at her Willard Street apartment in Quincy. (Tr. II/131, 143-144)[6]. Her roommates had left for the evening after she had gone to bed. (Tr. II/143-144). She was awakened by a stranger with dark skin. (Tr. II/144). The man held a knife to her throat and said he would kill her if she made noise. (Tr. II/146-147). He ordered her to remove her pants, pulled down his pants, and raped her vaginally with his penis. (Tr. II/147-149). He looked around the apartment, briefly left through a sliding door, then returned and told her not to make noise. (Tr. II/150-151). Then he left. (Tr. II/151).

The victim got dressed and immediately ran to her brother's nearby apartment, arriving around midnight. (Tr. II/151, 161, 163). Her brother and other family members were there; the victim told them what had happened to her. (Tr. II/164, 166). She showered and changed clothes, then they drove to a friend's house. (Tr. II/167, 168). From there, they went to the Quincy Medical Center. (Tr. II/169-170).

The victim was examined by a doctor and sexual assault nurse examiner and gave a statement to the police. (Tr. II/170-173). The nurse completed a sexual assault evidence collection kit. (Tr. III/30-31). Police went to the victim's apartment where they retrieved a

---

[5] As the Massachusetts Appeals Court did not make any findings of fact, the following facts have been taken from the trial transcript. See Jackson v. Thompson, No. 06-10066, 2007 U.S. Dist. LEXIS 19740, * 1, n.1 (D. Mass. 2007); see also Healy v. Spencer, 453 F.3d 21, 22 n. 1 (1st Cir. 2006) (court may consider facts from the record consistent with the state court's findings).

[6] "Tr._" refers to the Transcript of Proceedings for the trial filed by Respondent. [Docket #28] (Tabs 7-13).

stained bed sheet, tissue paper, a butter knife, and Dunkin Donuts coffee cups. (Tr. III/115, 117, 118, 119). The victim described the assailant as a black man between twenty and thirty years old, average build, and taller than her. (Tr. II/144-145). He wore a dark knit hat. (Tr. II/145). When shown an array, which included a photograph of the petitioner, she was unable to identify anyone as her assailant. (Tr. III/157).

On December 31, 2000, a few days after the assault, there was a disturbance at Nock's apartment and Nock's wife called the police. (Tr. IV/20-22). When the police arrived, she told them that Nock had been gone for four days, she had changed the locks and that when Nock came home, he was upset about this. (Tr. IV/21-22). She said he had taken her motor vehicle and she did not know where it was. (Tr. IV/22). That same day, Randolph police obtained $400 in cash, gloves, and a dark wool cap from Nock. (Tr. IV/26).[7]

A.    DNA Evidence

1.    The Identification of Nock

In December 2000, Kerrie Donovan, a member of the criminalistics unit of the Massachusetts State Police Crime Laboratory, examined the victim's sexual assault kit, which

---

[7] Nock's wife did not testify at trial and invoked the spousal privilege. (Tr. I/5). Before admitting her statements, the trial judge conducted a voir dire of the officer through whom the Commonwealth proposed introducing her statements. (Tr. IV/5-16). During the voir dire, Randolph police Officer McSweeney testified that, on December 31, 2000, he responded to a 911 call placed by the defendant's wife. Id. Upon arriving at the scene, he found the defendant and his wife in a hallway, "yelling and screaming at each other." (Tr. IV/9). The defendant's wife was "hysterical." Id. The officer took the her aside and asked, "[W]hy was she so upset? [W]hat was going on? Why were we called?" (Tr. IV/10). The wife, still screaming, yelling, and crying, told the officer that the defendant had been missing for four days and had taken her car, that he had become upset when he returned and found that she had changed the locks, and that the car was missing. Id. The judge allowed the officer to testify to the wife's statements. (Tr. IV/15-16). Nock's counsel did not object to this testimony. (Tr. IV/15, 19-23).

had been delivered to the State Crime Lab by Quincy Police Detective John Steele. (Tr. IV/28-31). She did an extraction for semen and amylase on the vaginal swab and found semen. (Tr. IV/38-40). A screening test detected blood. (Tr. IV/41). Donovan packaged the swabs and smear slides for DNA testing. (Tr. IV/42).

On March 8, 2001, Kristen Sullivan, a Chemist and DNA unit supervisor at the State Crime Lab, retrieved the vaginal swabs Donovan had prepared. (Tr. IV/88, 98). She prepared the swabs for shipping and, on March 12, 2001, sent them to Orchid Cellmark Diagnostics for DNA analysis. (Tr. IV/99-100).

On March 13, 2001, Margaret Terrill, a DNA Analyst at Orchid Cellmark, received the vaginal swab and blood card that Sullivan had sent. (Tr. V/70, 78). Terrill's report regarding her testing of the vaginal swab was dated May 15, 2001. (Tr. V/95).

On May 15, 2001, Sullivan received the test results from Orchid Cellmark. (Tr. IV/101). She requested and received Orchid Cellmark's raw data to evaluate the DNA profile for entry into the state CODIS ("Combined DNA Index System") database. (Tr. IV/101). Sullivan submitted the male DNA profile (a series of numbers) to CODIS Administrator Robert Pino to be uploaded into CODIS. (Tr. IV/105, 112).

On June 13, 2001, Pino received Sullivan's request to submit the male DNA profile from the victim's vaginal swab to the statewide database to compare against known profiles in that database. (Tr. IV/121, 126). On November 16, 2001, this profile matched all thirteen core loci of a database profile that belonged to Nock. (Tr. IV/126-128). Quincy Police Detective Steele was notified of the match. (Tr. IV/128).

On December 14, 2001, Nock spoke with Quincy Police about the rape. (Tr. III/125).

Nock initially said he had been in Virginia at the time. (Tr. III/131). When confronted with records showing he had stayed at a Braintree motel on December 29, 2000, he said he had been there with an unnamed female friend. (Tr. III/132, 135, 195). He said before staying at the motel he had been gambling in Connecticut with acquaintances whose full names he did not know. (Tr. III/136). He said he had been awake for several days and had not gotten a room. (Tr. III/137-138, 195-196).

In June 2002, Quincy Police resubmitted the sexual assault kit, bed sheet, underpants, and pants to the State Crime Lab for testing. (Tr. IV/47). Donovan examined the underpants with an alternate light, marked areas that fluoresced, and took cuttings. (Tr. IV/49-50, 52-53). She found sperm cells in the areas that fluoresced. (Tr. IV/54). She examined the pants and sheet and found sperm cells. (Tr. IV/61, 64). Donovan made cuttings of areas that tested positive for blood or semen and packaged them. (Tr. IV/66-67). The packaged items were stored in the evidence control unit freezer. (Tr. IV/67).

2.     The Testing of Nock's Blood

On November 15, 2002, pursuant to court order, the state police obtained a blood sample from Nock. (Tr. III/236-240). That same day, the state police delivered that sample to the State Crime Lab. (Tr. V/64-65). On March 3, 2003, Cailin Lally, a chemist in the DNA unit of the State Crime Lab, generated a profile at thirteen loci from Nock's blood sample and drafted a report containing Nock's numerical DNA profile and sent that report to Orchid Cellmark. (Tr. V/65-67).

In May 2003, Terrill at Orchid Cellmark received Nock's numeric DNA profile. (Tr. V/79). On June 18, 2003, she received cuttings from a sheet, pants, and underpants from the

investigation. (Tr. V/79-80). Terrill personally performed DNA analysis on these samples. (Tr. V/80). She generated three reports that were reviewed by her supervisor, Dr. Lewis Maddox. (Tr. V/81). Terrill compared the known profiles of Nock and the victim with the profile extracted from the underpants. (Tr. V/83). Terrill concluded that the DNA profile found in the sperm fraction from the underpants matched Nock's DNA profile, and the likelihood of a random match in the African-American population would be one in 1.4 quadrillion. (Tr. V/84, 87).

Terrill obtained a DNA profile from the victim's vaginal swab, compared the sperm fraction from the vaginal swab, and determined that the primary profile matched Nock and that the likelihood of a random match among African-Americans would be one in 1.4 quadrillion. (Tr. V/88-89). She obtained a DNA profile from the sheet cuttings and concluded that the source of the sperm fraction was a single source male, and that the contributor's DNA profile matched Nock. (Tr. V/93). Terrill performed DNA analysis on cuttings from the pants. (Tr. V/90). Because there was an insufficient amount of DNA, only the Profiler-Plus test could be performed. (Tr. V/91). Results were obtained at eight locations. (Tr. V/91). The results at those eight locations were consistent with Nock's DNA profile. (Tr. V/36, 99).

## III.    HABEAS CORPUS STANDARD OF REVIEW

Nock cannot obtain federal habeas relief under 28 U.S.C. § 2254(d) for any claim that a state court "adjudicated on the merits" unless he can show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); RaShad v. Walsh, 300 F.3d 27, 34 (1st Cir. 2002).

The language barring federal review if a petitioner's claim was "adjudicated on the merits" is "in part, a reference to the long standing rule that federal courts do not review state court decisions which rest on 'independent and adequate state grounds.'" Simpson v. Matesanz, 175 F.3d 200, 205-6 (1st Cir. 1999) (quoting Trest v. Cain, 522 U.S. 87 (1997)). "Such independent and adequate grounds exist where 'the state court declined to hear the federal claims because the prisoner failed to meet a state procedural requirement.' In such a case, 'considerations of comity and federalism bar the federal court's review.'" Id. at 206.

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at 406. The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. "[E]ven a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." Harrington v. Richter, 562 U.S. ___, No. 09-587, 2011 U.S. LEXIS 912, at *6 (January 19, 2011).

## IV.    DISCUSSION

### A.    Confrontation Clause – Admission of Wife's Out of Court Statements

Nock argues that the admission of his wife's out of court statements to police after they

responded to a 911 call at his residence violated his Confrontation Clause rights under the Sixth Amendment as stated in Crawford v. Washington, 541 U.S. 36 (2004) and Davis v. Washington, 547 U.S. 813 (2006). Petition p. 5; Memo. in Supp., p. 4-11. Respondent argues that this claim is procedurally defaulted because Nock did not object to the admission of his wife's statements at trial. Res. Br., p. 8-13. As discussed below, this court recommends that Nock's habeas petition regarding this claim be denied.

### 1. Independent and Adequate State Ground

A state court's decision to find a forfeiture based on the defendant's failure to object at trial is an "independent and adequate state ground" for a decision so long as the state court consistently applies its contemporaneous objection rule and has not waived it in the particular case by basing the decision on some other ground. Lynch v. Ficco, 438 F.3d 35, 45 (1st Cir. 2006); Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995). Here, the parties do not dispute that Nock did not object to the admission of his wife's statements at trial. Massachusetts has routinely enforced and consistently applied its contemporaneous objection rule. Lynch, 438 F.3d at 45; Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir. 1999); Burks, 55 F.3d at 716. Accordingly, this Court may not review Nock's Confrontation Clause claim unless the Appeals Court[8] waived the state's contemporaneous objection rule.

### 2. Waiver

Nock argues that this Court may review his claim because: (1) the Appeals Court did not

---

[8] The Supreme Judicial Court denied Nock's application for further appellate review and, thus, this Court must "'look through to the last reasoned decision' to determine the basis for the state court's holding." Junta v. Thompson, 615 F.3d 67, 71 (1st Cir. 2010) (quoting Malone v. Clarke, 536 F.3d 54, 63 n. 6 (1st Cir. 2008)). Accordingly, this Court reviews the decision of the Massachusetts Appeals Court. Id.

clearly and expressly rely on an independent and adequate state ground; (2) the Appeals Court's statement of "[n]o objection was made below, and so we review under the well-known standard of Commonwealth v. Alphas" falls short of an explicit reliance on state law; and (3) that the Appeals Court waived its contemporaneous objection rule because it affirmed his conviction based on an analysis of federal law.  Rebut., p. 1-5.

A procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar.  Harris v. Reed, 489 U.S. 255, 263 (1989).  The Harris presumption applies only when the "decision of the last state court to which the petitioner presented his federal claims...fairly appear[s] to rest primarily upon federal law or to be interwoven with federal law."  Mainsy v. Maloney, 283 F. Supp. 2d 307, 313 n.5 (D. Mass. 2003) (quoting Coleman v. Thompson, 501 U.S. 722, 735 (1991)).

The Appeals Court decision appears to be interwoven with federal law, and therefore the Harris presumption applies.  When addressing Nock's claim, the Appeals Court stated that because "[n]o objection was made below" it would review Nock's claim "under the well-known standard of Commonwealth v. Alphas, 430 Mass 8, 17, 712 N.E.2d 575 (1999)." Commonwealth v. Nock, 74 Mass. App. Ct. at *1.  This statement suggests that the Court was relying on the state's contemporaneous objection rule to deny Nock's claim and therefore would be an independent and adequate state ground that would bar this Court's review.[9]  However, the

---

[9] The Appeals Court's review of Nock's claim under the substantial miscarriage of justice or "Alphas standard" would not "amount to a waiver of the state's contemporaneous objection rule."  Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2010); see also Horton v. Allen, 370 F.3d 75, 81 (1st Cir. 2004) ("this sort of limited review does not work a waiver of the contemporaneous objection requirement") (citations omitted); Gunter v. Maloney, 291 F.3d 74,

Appeals Court did not in fact perform the analysis under <u>Alphas</u>,[10] but proceeded to determine whether the trial court's admission of the wife's statements was error and analyzed the trial court's decision to admit the wife's statements under <u>Crawford v. Washington</u>.  <u>Id.</u> at *1.

Respondent argues that the Appeals Court's analysis of federal law was an alternative holding.  Res. Br., p. 12-14.  Although <u>Harris</u> permits procedural default in the face of alternative holdings, <u>see</u> <u>Harris</u>, 489 U.S. at 266, n. 13, the Appeals Court did not indicate that its discussion on federal law was an alternative holding.  Moreover, as in <u>Delaney</u>, the Appeals Court decision here may not have "'clearly and expressly' relied on the procedural default rule, as required by <u>Harris</u>, in dismissing [Nock's] claims." <u>Delaney v. Bartee</u>, 522 F.3d 100, 104 (1st. Cir. 2008).  Nevertheless, the Court does not need to resolve this issue, as in any event, the Appeals Court decision does not warrant habeas relief.

3.      Appeals Court Decision Was Not Contrary To Or An Unreasonable
Application Of Clearly Established Federal Law

Nock is not entitled to habeas relief because the Appeals Court's decision was neither contrary to nor an unreasonable application of federal law. In <u>Crawford v. Washington</u>, the

_____

80 (1st Cir. 2002) ("The mere fact that a state appellate court engages in a discretionary, and necessarily cursory, review under a 'miscarriage of justice' analysis does not in itself indicate that the court has determined to waive an independent state procedural ground for affirming the conviction.") (quotation omitted).

[10]  The Appeals Court stated that because it did not find any error, it "need not reach the question whether there was a substantial risk of a miscarriage of justice."  <u>Id.</u> at *1, n. 2.  Although the argument could be made that when the Appeals Court found no error it implicitly concluded that there was no substantial miscarriage of justice under <u>Alphas</u>, this argument was rejected by the First Circuit in <u>Delaney v. Bartee</u>, 522 F.3d 100, 104 (1st Cir. 2008) (Supreme Judicial Court may not have clearly and expressly relied on procedural default rule when it pointed out that the defendant did not make a timely objection but then went on to examine whether there was error and not whether there was a substantial risk of miscarriage of justice).

Supreme Court held that the Confrontation Clause to the Sixth Amendment barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004) (use of defendant's wife's out of court statements taken during police questioning violated the Sixth Amendment). In Davis v. Washington, the Supreme Court addressed the application of Crawford and specifically focused on whether the subject statements were "testimonial." Davis v. Washington, 547 U.S. 813 (2006) (reviewing admissibility of statements made in two different state cases, one which involved statements made to a 911 operator and the other made to an officer at a crime scene when the alleged perpetrator was in another room). The Davis Court held that statements are nontestimonial, and therefore are not subject to the Confrontation Clause, when made "in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. at 822. Statements are testimonial when "the circumstances objectively indicate that there is no ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id.

The Davis Court identified several factors to guide courts in this objective inquiry, including:

> (1) Was the declarant speaking about current events as they were actually happening, "requiring police assistance" rather than describing past events?

> (2) Would a "reasonable listener" conclude that the declarant was facing an ongoing emergency that called for help?

> (3) Was the nature of what was asked and answered during the course of a 911 call such that, "viewed objectively, the elicited statements were necessary to be able to

resolve the present emergency" rather than "simply to learn . . . what had happened in the past?"

(4) What was the "level of formality" of the interview? For example, was the caller frantic, in an environment that was neither tranquil nor safe?

United States v. Cadieux, 500 F.3d 37, 41 (1st Cir. 2007), citing Davis, 547 U.S. at 826-829.

Nock argues that the Appeals Court incorrectly applied Crawford and Davis because his wife's statements to police were not made to resolve an ongoing emergency or to provide medical attention. Memo. in Supp. p. 4-5. As support for this, Nock argues that his wife was at a neighbor's home when questioned by police, that she spoke to the officer in private, and that the situation had diffused. Id.

Reviewing the Appeals Court decision, this Court cannot agree that it was contrary to or based on an unreasonable application of federal law. In holding that the admission of the wife's statements did not violate Nock's Sixth Amendment rights, the Appeals Court engaged in the following analysis:

> Here, 'the officer's query and the victim's response were part of an attempt by the police to comprehend and deal with what appeared to be a volatile situation.' Commonwealth v. Burgess, 450 Mass. 422, 431, 879 N.E.2d 63 (2008). When Officer McSweeney arrived, the defendant and his wife were in the midst of an ongoing altercation serious enough to disturb the neighbors, prompt the wife to call 911, and during which the defendant had violently broken through a door. See Commonwealth v. Gonsalves, supra at 8-9 (questioning is nontestimonial if needed to secure a volatile scene). The officer's questions to the wife in this context ('[W]hy was she so upset? Why were we called?') were, objectively viewed, not designed to elicit testimony in the constitutional sense of the *Sixth Amendment*, but were rather an effort to comprehend the volatile domestic situation the officers were walking into. See Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) ('Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency').

Commonwealth v. Nock, 74 Mass. App. Ct. at *1.

The Appeals Court identified the correct federal law and applied it to the facts in a manner that was neither contrary to nor an unreasonable application of federal law. Nock's wife had sought immediate assistance via a 911 call. The Appeals Court found that Nock and his wife "were in the midst of an ongoing altercation." Id. It further found that the officer's questions were necessary to resolve the situation. Id. Thus, the Appeals Court applied the Davis factors and reasonably applied federal law. Even though Nock presents facts that challenge whether the statements are nontestimonial, this does not mean that the Appeals Court unreasonably applied federal law. See McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002); Atkins v. Clarke, No. 08-30031, 2010 U.S. Dist. LEXIS 72200, at *12 (D. Mass. April 16, 2010). Accordingly, this Court recommends that the habeas petition be denied as it relates to Nock's claims regarding the admission of his wife's out of court statements.

  B.  <u>Due Process Claim</u>

Relying mainly on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), Nock argues that the state court's denial of his motion for a new trial was erroneous. Nock bases his motion on the trial court's denial of his discovery request for allegedly exculpatory and impeachment evidence in the form of proficiency test results and laboratory audits of the state laboratory. Petition, p. 8; Memo. in Supp., p. 12-33; Rebut., p. 5-6. Nock argues that these proficiency test results and the audits (which Nock alleges state that errors were found in profiles that Robert Pino, CODIS administrator for the State Police Crime Laboratory, entered into CODIS) would have cast doubt on the DNA identification used in this case, and the statistical validity of the

evidence presented, particularly because the victim could not identify him.[11]  Memo. in Supp.

p. 13, 29.  Nock also argues that the lack of this information impaired his counsel's ability to

cross-examine the Commonwealth's witnesses and prepare his defense.  Id. at 17.

Accordingly, he alleges that the denial violated his Due Process rights.  For the reasons

stated below, this Court recommends that the District Court deny habeas review regarding

this claim.

The Appeals Court's decision was not an unreasonable application of clearly

established federal law, as determined by the Supreme Court of the United States.[12]  The

clearly established law governing the mandatory disclosure of exculpatory evidence is set

forth in Brady, 373 U.S. at 97.  In order to obtain a new trial under Brady, the Supreme Court

has identified a three-part test: (1) the "evidence at issue must be favorable to the accused,

either because it is exculpatory or because it is impeaching; (2) that evidence must have been

suppressed by the State, either willfully or inadvertently; and (3) prejudice must have

---

[11]  In support of his new trial motion, Nock relies on a U.S. Department of Justice, Office
of Inspector General ("DOJ/OIG") Report and a report prepared for the Commonwealth of
Massachusetts Executive Office of Public Safety by Vance, a consulting firm (the "Vance
Report") which reviewed the procedures at the subject laboratories.  These documents were
released after the conclusion of Nock's trial in 2005.  The DOJ/OIG Report is dated September,
2006.  (S.A. 237).  The Vance Report is dated June 29, 2007.  The Commonwealth
acknowledged in its state court briefing that the reports were essentially audits of the State Crime
Lab and covered the time period during which DNA testing was done in this case.  (S.A. 398,
402).

[12]  There is no requirement that a state court cite or even be aware of Supreme Court
cases in its decision so long as "neither the reasoning nor the result of the state-court decision
contradicts them."  McLaughlin v. Corsini, 577 F.3d 15, 20 (1st Cir. 2009) (quoting Early v.
Packer, 537 U.S. 3, 8 (2002)).  Nor is it an issue that the Appeals Court cited Massachusetts
cases in support of its reasoning, as those cases discussed Brady.  See Ellen v. Brady, 475 F.3d 5,
11-12 (1st Cir. 2007).

ensued." Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003) (quoting

Strickler v. Green, 527 U.S. 263, 281-2 (1999)).  Prejudice exists only if there is a

"reasonable probability of a different result" had the evidence been disclosed.  Healy, 453

F.3d at 25 (quoting Banks v. Dretke, 540 U.S. 668, 691 (2004)).  "'Reasonable probability'

denotes a probability sufficient to 'undermine confidence in the verdict.'" Id., (quoting Kyles

v. Whitley, 514 U.S. 419, 435 (1995)).  However, the Brady test is not a sufficiency of the

evidence test.  Conley v. United States, 415 F.3d 183, 189 (2005).

1.      The Appeals Court Decision Was Not Contrary To Established Federal
Law

Although Nock argues to the contrary, Memo. in Supp., p.12-34; Rebut., p. 5-6., there

is no valid argument that the decision is "contrary to" clearly established federal law.  The

Supreme Court has stated:

> Under the 'contrary to' clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by this Court
> on a question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.

Williams v. Taylor, 529 U.S. at 412-3.  Here, the Appeals Court applied the proper rule of

law by asking if the defendant was prejudiced, see Strickler, 527 U.S. at 281-2, and there is

no Supreme Court case involving "materially indistinguishable facts" that is contrary to the

outcome here.  Rather, the debate centers on whether the Appeals Court decision was an

"unreasonable application" of the federal rule on prejudice to the facts of the case here.

2.      The Appeals Court Decision Did Not Unreasonably Apply Federal Law

The Williams Court states "[u]nder the 'unreasonable application' clause, a federal

habeas court may grant the writ if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

19

facts of the prisoner's case."  Williams, 529 U.S. at 413.  The Supreme Court further clarified

that unreasonableness must be an objective standard, and that an erroneous or incorrect

application is not necessarily an unreasonable application.  Id. at 410, 411.

Here, the Appeals Court found no Brady violation.  In affirming the trial court's

denial of Nock's new trial motion, the Appeals Court found the following:

> *New trial motion*. The defendant moved for a new trial on the ground that his due
> process rights had been violated because the Commonwealth had not produced
> exculpatory evidence, specifically audits and proficiency test results regarding the
> State DNA lab and/or its employees.  Evidence is exculpatory if it tends to negate
> the guilt of the accused.  Commonwealth v. Ellison, 376 Mass. 1, 22 n.9, 379 N.E.2d
> 560 (1978).  Here, as the motion judge (who was also the trial judge) correctly
> concluded, there was nothing to indicate that the evidence would have helped *this*
> defendant. See Commonwealth v. Laguer, 448 Mass. 585, 595, 863 N.E.2d 46
> (2007) (evidence that is not shown to have any bearing on the defendant's guilt or
> innocence is not exculpatory as to that particular defendant).  The defendant was
> allowed funds to retain, and did retain, his own expert to examine the DNA
> evidence.  He, however, presented no evidence on the topic at trial, which
> undermines his posttrial claim that the audit and proficiency materials might have
> been helpful to him.  Moreover, he has presented nothing to suggest that any
> information in the audit reports or proficiency reports related to the testing or
> processing of his own DNA sample or the validity of the match made in his case.
> We conclude, therefore, that the judge did not abuse her discretion in deny the
> motion for new trial.

Commonwealth v. Nock, 74 Mass. App. Ct. at *2.  While the Appeals Court did not delineate

precisely which component of the Brady analysis Nock failed to satisfy, the opinion is

reasonably construed as finding that Nock did not suffer the sufficient level of prejudice.

As the First Circuit has stated: "There is no prejudice under Brady and so no due

process violation unless there is a "reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."

McCambridge, 303 F.3d at 37 (quoting United States v. Bagley, 473 U.S. 667 (1985));

United States v. Agurs, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of

undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish the 'materiality' in the constitutional sense.").

Here, the Appeals Court correctly concluded that there was no reasonable probability that the result at trial would have been different. First, the evidence sought by Nock, and indeed the arguments presented in the instant petition, see e.g. Memo. in Supp., p. 27-31, center on the CODIS match that was presented at trial to explain how the Commonwealth's investigation came to focus on Nock. The substantive evidence used to establish Nock as the perpetrator of the charged crimes was not based on the CODIS match but on a direct comparison Cellmark performed of Nock's court-ordered DNA sample with specimens from the victim and crime scene. (Tr. V/79-99).

More importantly, Nock was provided with funds to conduct his own independent DNA testing. (S.A. 6-7, 9, State Docket ##23-24, 58-59; S.A. 413-414); Transcript of May 31, 2005 Proceedings at 12 [Docket #28]. He, in fact, conducted such testing. (S.A. 413-414); Transcript of May 31, 2005 Proceedings at 11. If an error occurred in the determination of Nock's DNA profile and its subsequent matching to the Commonwealth's samples, Nock's expert was in a position to find such error. Nock, however, presented no evidence on the subject at trial. Commonwealth v. Nock, 74 Mass. App. Ct. at *2.

Nock's supplemental arguments in support of his contention that a Brady violation occurred are also to no avail. For example, Nock argues that the state courts incorrectly placed the burden on him to show that the evidence was exculpatory. Memo in Supp. p. 16. The Appeals Court was correct. Under Brady, a defendant has the burden of demonstrating that the suppressed evidence is exculpatory and material. United States v. Caro-Muniz, 406 F.3d 22, 29 (1st Cir. 2005); United States v. Bey, 188 F.3d 1, 4 n.2 (1st Cir. 1999); United

States v. Wilson, 798 F.2d 509, 514 (1st Cir. 1986). The Appeals Court reasonably concluded that Nock had not made this showing.

Nock also argues that the state courts should have conducted an in camera review of the requested materials. The Supreme Court has in certain circumstances granted habeas relief where courts did not conduct an in camera review of certain documents. See Pennsylvania v. Ritchie, 480 U.S. 39 (1987). However, such review is typically triggered by a preliminary showing that the requested records contain material evidence. See, e.g., Harrison v. Lockyer, 316 F.3d 1063, 1066 (9th Cir. 2003). As discussed supra, it was not unreasonable for the state courts to have declined Nock's request.

Accordingly, it was not unreasonable for the Appeals Court to conclude that, even if Nock had received the requested information, there was no "reasonable probability that . . . the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

C.        Cumulative Error

Nock's final claim is that the combination of the admission of his wife's out of court statements and the denial of access to the requested DNA materials denied him a fair trial. Petition, p. 9; Memo. in Supp., p. 35-38; Rebut., p. 7. Although it is true that "individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect," United States v. Sepulveda, 15 F.3d 1161, 1195-6 (1st Cir. 1993), that is inapposite here. The individual rulings did not, as discussed supra, harm Nock's rights and there were no individual errors. United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007).

## V. RECOMMENDATION

For the foregoing reasons, I recommend that the Court DENY Troy Nock's Petition for Writ of Habeas Corpus in its entirety.

## VI. REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge